## MASON v. PAN AMERICAN PETROLEUM & TRANSPORT CO. et al.

### THE CRAMPTON ANDERSON.

### THE N. Y. C. NO. 33.

### No. 10869.

District Court, E. D. New York

Nov. 26, 1930.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark, and Stanley R. Wright, both of New York City, of counsel), for the Crampton Anderson.

Otto & Lyon, of New York City (Henry E. Otto and Edward F. Platow, both of New York City, of counsel), for libelant Mason and the Viking No. 2.

O'Brien, Malevinsky & Driscoll, of New York City (Edward J. Clark, of Buffalo, N. Y., of counsel), for Frank H. Van Schaack.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Roger Siddall, of New York City, of counsel), for respondent Tide Water Oil Co.

Foley & Martin, of New York City (John R. Stewart, of New York City, of counsel), for the Newark and New York Towboat Co.

Macklin, Brown, Lenahan & Speer, of New York City (Paul Speer, of New York

City, of counsel), for Standard Transportation Co.

Bigham, Englar, Jones & Houston, of New York City (C. W. Hagen, of New York City, of counsel), for libelant The New York Central R. Co.

MOSCOWITZ, District Judge.

These suits are for salvage services claimed to have been rendered by six tugs, Newark, Viking No. 2, Socony No. 17, Socony No. 15, Socony No. 6, New York Central No. 33, and two individuals, Wilfred F. Mason, super cargo on the tug Viking No. 2, and Frank H. Van Schaack, as master of the tug New York Central No. 33. in assisting the Crampton Anderson from her berth alongside Pier 1, Tide Water oil docks, Bayonne, N. J., to an anchorage in Kill van Kull, and later to an anchorage off Tompkinsville, Staten Island.

The dimensions of the vessels involved and their values were stipulated or testified to without dispute, as follows:

"Crampton Anderson—steel steam tanker of 6998 tons gross; 435 feet long, 56 feet beam and 33 feet depth of hold; 2,700 horsepower; value $650,000; value of cargo $48,000.

"Socony 6—iron steam tug of 89 tons gross; 72 feet long, 18 feet beam, 9 feet depth; 250 horsepower; value $15,000.

"Socony 15—steel steam tug of 164 tons gross; 91 feet long, 22 feet beam, 9 feet depth; 500 horsepower; value $35,000 to $40,000.

"Socony 17—steel steam tug of 175 tons gross; 96 feet long, 23 feet beam, 11 feet depth; 650 horsepower; value $35,000 to $40,000.

"Newark—wooden steam tug of 69 tons gross; 68 feet long, 19 feet beam, 8 feet depth; 150 horsepower; value $35,000.

"Viking II—wooden motor tug of 49 tons gross; 70 feet long, 17 feet beam, 8 feet depth; 220 horsepower; value $30,000.

"N. Y. C. No. 33—steel diesel electric tug of 242 tons gross, 103 feet long, 26 feet beam, 11 feet depth; 800 horsepower; value $165,000 to $170,000."

The steamship Crampton Anderson, with a cargo of crude oil, had docked during the afternoon of February 10, 1928, and had been discharging her cargo by means of hose connections and lines running from the steamship to the dock since 2 o'clock. At about 7 o'clock in the evening, the weather being clear and the wind light, the Crampton Anderson was lying, bow in shore, on the east side of pier 1, with some of her tanks partly unloaded, when a fire broke out on pier 2. The stern of the Crampton Anderson slightly overhung the end of pier 1, which was about 570 feet long. Pier 2 was about 430 feet long, and the outer end was covered with a wooden shed. About 150 feet of water separated the two piers. The tug N. Y. C. No. 33 was lying moored to the west side of pier 2, and the tug Viking No. 2, with her gasoline barge, Mileage 15, was made fast on the east side of pier 2 at the bulkhead. The tug Newark was proceeding down the Kill van Kull with a tow. The Socony No. 6 was on fire watch at the Standard Oil Company's terminal further up the Kill van Kull, and the Socony No. 15 and Socony No. 17 were somewhere in the immediate vicinity. Although there was some difference of opinion as to the extent of the fire which broke out on the east side of pier 2 and destroyed the covered portion thereof, it appears that the fire was serious in nature. Chief Officer Roebuck of the Crampton Anderson testified that, before clearing the slip, the ship was thirty feet away from the fire, and it was scorched as a result. The testimony of Roebuck, as to the spread of the fire after the ship had cleared the slip, is significant, in view of the fact that claimant contends that there was no fire at pier 1. He testified as follows:

"Q. As a matter of fact, within five minutes after the steamer left the slip, wasn't Pier 1 ablaze? A. Yes.

"Q. And the steamer was in the slip between Pier 2 and Pier 1? A. Yes.

"Q. So that if Peir 1 was ablaze, the Crampton Anderson would have been ablaze before Pier 1, wouldn't it? It was in the range of fire, wasn't it? Isn't that a fact? A. Yes.

"Q. Now on Pier—A. But that started after we got away from the slip.

"Q. About five minutes? A. Yes. We could see that after we got away from the dock—it seemed to spread."

Roebuck further testified that the slip where the Crampton Anderson had been moored was also on fire. It is apparent that he regarded the fire as serious, and that it was of vital importance that the ship be removed from the scene of the fire. He testified as follows:

"Q. What was the condition of the fire at the time the steamer was making sternway? A. The dock was a total mass of flame.

"Q. Did the flames shoot high into the air? A. Yes, they did.

"Q. Approximately how high? * * * A. Well now, I should say from the top of the covered shed—about 40 feet.

"Q. Did the steamer Crampton Anderson receive any scorching or burning? A. She did.

"Q. Was the steamer on the starboard side pretty well scorched? A. The amidship lifeboat and the amidshiphouse was scorched.

"Q. Is that all? A. The booms—the ship's booms."

"Q. Minutes meant a lot at that time, didn't they? A. Yes.

"Q. Five more minutes and you might not be here to testify? A. I would say probably that.

"Q. Did you ever have any fires before? A. Not like this.

"Q. This was the worst fire you had ever been through on a tanker, isn't that a fact? A. Yes."

At the time of the fire there were twenty-two members present out of the full complement of forty-one officers and crew on the Crampton Anderson. The officers, under the command of Chief Officer Roebuck, immediately took up their positions. The first assistant engineer went to the engine room and started warming up the engines, while the boatswain began to chop off the lines and hose. The third assistant engineer ran aft and took charge on the stern, after ordering the pump man to shut off the cargo pumps. Five minutes after the fire was discovered, the engines of the ship were going, and about three minutes later the ship was backing clear of the slip aided by tugs. In going out, the ship broke some of the lines which had not been cut or cast off. While backing out, her stern canted slightly to port and within 20 to 30 feet of the burning pier. The ship continued out into the stream, and was anchored near Port Johnson Stakes at a point about 500 feet off pier 1, and later, with the assistance of several tugs, the ship proceeded to an anchorage off Tompkinsville, Staten Island.

■ While it is true that the Crampton Anderson could have backed clear of the slip without any assistance, the tugs were instrumental in preventing unnecessary delay. The element of time was extremely important in this emergency. The fire on pier 2 was spreading toward pier 1, and the fact that the Crampton Anderson, partly loaded with oil, was lying moored on that side of pier 1 near-est to pier 2, does not justify the contention of the claimant that the Crampton Anderson was in no immediate danger. Any delay in moving the vessel from this perilous position would have been dangerous. However, the tugs which assisted are only entitled to partial credit. There was considerable conflict on the trial as to which tug arrived first and the services performed by each. If all the testimony is to be believed, each of the tugs, with one or two exceptions, arrived first at the scene of the fire. The testimony upon this point goes to the credibility of the witnesses. But it is not controlling which tug arrived first, for this decision must depend upon the services performed by the tugs.

■ The Newark, while passing abreast of the Tide Water Oil Plant, observed a flame suddenly shoot up on pier 2, and immediately proceeded to the assistance of the Crampton Anderson. As it neared the end of pier 1, a violent explosion occurred, and a short time thereafter several men on the end of pier 1 cast one of the mooring lines of the Crampton Anderson from the pier to the Newark, which line was made fast. The Newark immediately started to pull the Crampton Anderson out of the slip. While backing out, the sternway of the steamer was increased, due to the fact that the Crampton Anderson's propellor was working astern, and the Newark thereupon took a position on the Crampton Anderson's port side, going full speed ahead. This was done to hold and keep the steamer straight while she was backing out, for it was imperative that the stern of the Crampton Anderson be held up into the flood tide in order to prevent the ship from canting in the slip and becoming jammed between the two piers. At about this time the Viking No. 2 arrived, and one of the Crampton Anderson's stern lines was passed to the Viking No. 2, which took a position on the port quarter and maintained that position until the Crampton Anderson first dropped anchor. Shortly after the arrival of the Viking No. 2, the Socony No. 17 and Socony No. 15 arrived and took a position on the port quarter of the ship as soon as the Crampton Anderson was in a position to allow them to do so. These four tugs concerted in their efforts to hold the stern of the steamer up into the tide as the steamer was backing out. Thereafter the Socony No. 6 joined the other tugs on the port side of the Crampton Anderson while she was backing out of the slip. The tug N. Y. C. No. 33, which was lying moored to the west side of Pier 2 at the time the fire started, caught fire due to the spray of oil. Appar-

ently, the crew was more concerned with putting out the fire on its tug than in aiding the Crampton Anderson. However, after the fire was extinguished on the tug N. Y. C. No. 33, and while the Crampton Anderson was going out of the slip, the N. Y. C. No. 33 proceeded to the Crampton Anderson and took up a position about amidship. The services rendered by the tug N. Y. C. No. 33 were not as valuable as those rendered by the other tugs. The Crampton Anderson was fairly well out of danger when she arrived at her first anchorage, and the towing of the ship, thereafter, to Tompkinsville, Staten Island, was largely a matter of the ordinary towage services.

It has been pointed out that the Crampton Anderson could have pulled out of the slip alone. I cannot agree with the libelants' contention that the absence of one of the four blades of the ship's propellor interfered very seriously with her movements. The blade had been broken for some time, and the vessel had traveled 3,000 miles with it in that condition, attaining the same rate of speed that she had made on previous trips with four good blades. At the same time claimant cannot deny that the tugs contributed valuable service. Time was very important, and it is manifest that the Crampton Anderson was removed from a perilous position in a shorter period of time than would have been possible had the vessel been unaided.

A claim was made by Captain Mason of the Viking No. 2 and one Gonigal, mate of Socony No. 17, for special services. Mason went on the Crampton Anderson after the Viking No. 2 arrived at pier 1, and subsequently aided in piloting the ship to Tompkinsville, Staten Island. For these services he is entitled to $50. Gonigal boarded the Crampton Anderson before she got away from the slip; this involved some risk on his part. He was of some aid to the chief officer in guiding the ship out of the slip, for which services he should be paid $50.

The following awards will be made:

Newark ........................ $2,500.00
Viking No. 2.................... $1,750.00
Socony No. 17.................. $1,250.00
Socony No. 15.................. $ 750.00
Socony No. 6................... $ 500.00
N. Y. C. No. 33................ $ 400.00

Between the steamtugs and their crews the award will be one-third to the crew and two-thirds to the owners. Settle decree on notice.